# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:08CR00024 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **DERRICK LAMONT EVANS**, | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for the United States; Sandra B. Jelovsek, Johnson City, Tennessee, for Defendant.*

The defendant has moved to withdraw his guilty plea. For the reasons that follow, the motion will be denied.

I

On August 13, 2008, this court accepted the guilty plea of the defendant, Derrick Lamont Evans, made pursuant to a written Plea Agreement, to conspiracy to possess with intent to distribute and distribute fifty grams or more of cocaine base, in violation of 21 U.S.C.A. §§ 841(b)(1)(A), 846 (West 1999 & Supp. 2009). His sentencing was delayed and nearly a year later, on July 6, 2009, Evans filed the present Motion to Withdraw Plea and Plea Agreement. An evidentiary hearing was

held on this motion on July 13, 2009, and this Opinion sets forth the court's findings of fact and conclusions of law.

Evans is one of fifty-one defendants charged in this case with offenses related to the distribution of crack cocaine. Following the Indictment, which was returned on May 28, 2008, the defendants were severed into manageable groups for trial. Most of the defendants eventually pleaded guilty, and of those who went to trial, all but one were convicted by juries.

Months before the first scheduled trial, Evans agreed to cooperate with the government. In a proffer statement, he described in detail the role he and others had played in the conspiracy. Under the terms of the Plea Agreement that followed, Evans agreed to plead guilty to the conspiracy charge and to cooperate with the government and disclose his knowledge of any criminal activity. In return, the government agreed to dismiss two of his three prior North Carolina felony drug convictions from a Sentencing Enhancement Information, a benefit that reduced his applicable statutory minimum sentence from life imprisonment to twenty years. *See* 21 U.S.C.A. § 841(b)(1)(A) (providing for mandatory minimum sentence of twenty years if there is a prior felony drug conviction and for a mandatory minimum sentence of life imprisonment without release if there are two or more prior felony drug convictions) and 21 U.S.C.A. § 851(a)(1) (West 1999) (providing that a person

-2-

cannot be sentenced to increased punishment by reason of one or more prior convictions unless government files information stating the previous convictions to be relied upon).

At his guilty plea hearing, Evans advised the court that he had a high school education; that he had worked as a licensed barber; that he had never been treated for mental illness of any type; that he had taken no medicine or drugs within the previous twenty-four hours; that he was not under the influence of alcohol; and that he had no current health problems. He confirmed that he had had an adequate opportunity both to discuss his case in general with his attorney, and more specifically, to read and discuss the Plea Agreement with the lawyer. He stated that he was fully satisfied with his lawyer's representation.

The terms of the Plea Agreement were summarized by the prosecutor and Evans agreed that those terms were included as he understood the agreement. He agreed that no promises had been made to him other than those contained in the Plea Agreement, and that no one had attempted in any way to force him to plead guilty.

In accord with Federal Rule of Criminal Procedure 11(b)(1), I advised Evans of his rights, the nature of the conspiracy charge, and the maximum possible and mandatory minimum penalties. The prosecutor then summarized the evidence amassed against Evans and his coconspirators:

-3-

[A] long term investigation by the Drug Enforcement Administration and other state and local law enforcement agencies determined that at approximately 2003 Derrick Evans, the defendant, and others from Burlington, North Carolina that were loosely affiliated with a music production company entitled Can't Stop Records, Inc.[1] began distributing crack cocaine and powder cocaine in Bristol, Tennessee, Bristol, Virginia, and transporting large quantities of cocaine from North Carolina to this area.

Some of the individuals involved were Marcus Andrew Watkins, Andre Lamont Watkins, Tyree Slade, Charles King, Kerry Lee, Oedipus Mumphrey and others from Burlington, North Carolina.

Once large quantities of cocaine were brought from North Carolina by, specifically, Mr. Evans and Kerry Lee, they would then recruit other individuals from Bristol, Virginia, Bristol, Tennessee to become subdistributors of that cocaine, crack cocaine.

In addition, Mr. Evans, and others, used numerous houses both in Bristol, Tennessee and Bristol, Virginia to transform powder cocaine into crack cocaine, and to then distribute from those houses, again recruiting others from the region to both distribute, to provide the residences to distribute from, and also to drive both Mr. Evans and others around to deliver crack cocaine to prospective customers.

The investigation of Mr. Evans recovered multiple ounces of cocaine and crack cocaine, over $25,000 United States currency, seized numerous vehicles and firearms, and it was also determined through the investigation that Mr. Evans did not have any legitimate income through the course of the conspiracy.

And the amount of cocaine and crack cocaine was over 50 grams of crack cocaine and over 500 grams of cocaine.

---

[1]  The name of the enterprise was actually "Kant Stop Records."

-4-

(Evans Guilty Plea Hr'g 15-17, Aug. 13, 2008.) Counsel for Evans clarified that the items seized were not seized from Evans personally, but Evans did not otherwise contest these facts. Evans' lawyer also stated on Evans' behalf that while Evans agreed that he was an organizer or leader of the conspiracy, he was not "necessarily the leader." (*Id.* at 9.) Evans agreed that he was pleading guilty because he was in fact guilty of the charge of conspiracy.

At the conclusion of the hearing, I found Evans fully competent and determined that his guilty plea was knowing and voluntary and accepted it.

Thereafter, during the first three of the series of trials of codefendants, Evans and other cooperating defendants testified for the government.[2] On February 3, 2009, in advance of a fourth trial,[3] the government moved to continue the sentencing hearings of the cooperating defendants until after the upcoming fourth trial, in order to allow them the opportunity for additional cooperation. The motion was granted. On April 14, 2009, the court received a letter from Evans in which he questioned his guilt of conspiracy. On April 30, 2009, his attorney moved to withdraw; that motion

---

[2] The first trial, which began on October 6, 2008, involved defendants Anthony Eugene Duty, Robin Marie Davis, and Evans' wife, Christine Evans. The second trial, which began on October 27, 2008, involved defendants Douglas Lee Stallworth and Bruce Edward Baumgardner. The third trial, which began on December 15, 2008, involved Travis Dell Jones and Brian Kendall Morrison.

[3] The fourth trial, which involved Reginald Darwin Morton, Tyson Anderson, and Charles Jermaine King, Jr., began May 26, 2009.

-5-

was granted on May 8, 2009, and present counsel appointed. On May 19, 2009, the government filed a notice that it considered that Evans had breached the obligations of his Plea Agreement. Evans did not testify at the fourth trial. Thereafter, on July 6, through his new attorney, Evans filed the present motion seeking to withdraw his guilty plea.

Based on Evans' letter and similar recantations by other cooperating defendants, defendants Duty, Davis, Stallworth, and Baumgardner moved for new trials. At an evidentiary hearing on these motions, held on June 18, 2009, Evans and the other recanting witnesses, Paul Vaughn and Marcus Watkins, testified. Evans also testified at the evidentiary hearing on the present motion seeking to withdraw his guilty plea.

Evans told basically the same story at each of his codefendants' trials in which he testified as a government witness. He explained his drug dealing background and testified about his relationship with other defendants and the extent of their criminal activity.

During his testimony at these trials, Evans again acknowledged the terms of his Plea Agreement. He understood that he faced a mandatory minimum sentence of twenty years in prison and that he could potentially receive a life sentence. He affirmed that the government had not promised him anything for his cooperation. He

hoped for leniency, but understood that his sentence would be set by the court, and not the government. He explained that although he had been offered a deal, he had "had an equal opportunity to go to trial and be proven guilty or not guilty." (Stallworth Trial Tr. 55, vol. I, Oct. 28, 2008.)[4] He understood that his guilty plea meant that he was "taking acceptance of the things that [he] did wrong and [was] saying that [he was] guilty for what [he did] wrong . . . ." (*Id.* at 56.)

Evans confirmed that his attorney had advised him of the consequences of his plea. With his attorney, he reviewed discovery materials and the Sentencing Enhancement Information. His attorney explained to him that he would be classified as a career offender, and that because of his "role or involvement as an organizer and leader," his sentence would be enhanced. (*Id.* at 69.) But he also understood that if he cooperated, the government might ask the court for a lower sentence.

During his testimony, Evans explained his involvement with the conspiracy and detailed its history. Evans testified that he was thoroughly familiar with the drug trade. In Burlington, North Carolina, he was a "go getter," which meant that he robbed drug dealers of their supply and sold it to other drug dealers for a less expensive price. (Duty Trial Tr. 181, vol. II, Oct. 8, 2008.) One of his victims

---

[4] The "Stallworth Trial" refers to the trial of Stallworth and Baumgardner. The "Duty Trial" refers to the trial of Duty, Davis, and Christine Evans.

eventually retaliated, causing him and his family to move to Johnson City, Tennessee, near Bristol.

Once there, Evans' cousin, Alexander Poole, introduced him to Stallworth. Stallworth convinced Evans to move to Bristol, because it was "wide open" for crack distribution. (Stallworth Trial Tr. 13, vol. I, Oct. 28, 2008.) Evans established his first distribution point in Bristol, Virginia. Thereafter, Stallworth acted as a middleman between Evans and other users.

Evans had two main sources of supply: Bryant Kelly Pride and Kerry Lee. Evans brought Pride to Bristol, after Pride was released from prison in North Carolina. They sold crack out of a house on Texas Avenue. No dealer trusted Evans, given his history of drug robberies, so Pride traveled alone to purchase their product. Evans purchased kilograms of cocaine from Pride, which Evans then distributed to the customer base that he had established in the area.

At some point, Evans and Pride traveled to Atlanta. Lee, a cousin to Evans, traveled from Burlington to Bristol to take Evans' "spot," meaning that while Evans was in Atlanta, Lee sold drugs from the same house that Evans used as a distribution point. (Duty Trial Tr. 189, vol. II, Oct. 8, 2008.) Evans and Lee subsequently became partners. They bought crack in Burlington and distributed it in the Bristol

-8-

area. They imported as much as five kilograms of cocaine on each trip. For approximately two or three years, Evans regularly dealt in kilograms.

When Lee moved to the Bristol area, Oedipus Mumphrey came with him. He originally worked for Lee, but then established his own distribution ring with the help of Paul Vaughn and Reginald Morton, both Burlington natives. Mumphrey sold crack from a mobile home on Anderson Street in Bristol, Tennessee. Across that street was Morton, selling from a different mobile home. Mumphrey eventually supplied Evans; first with small quantities but then with kilograms.

Evans used the profits from his drug trade to establish a music recording label called Kant Stop Records. It involved several of his co-defendants, including Marcus Watkins, Tyree Slade, Andre Watkins, and King. After the company failed financially, some of its members joined Evans in his drug pursuits.

Evans' cohorts helped him maintain his drug business while he was jailed on state charges for possession of marijuana. During the several trials, the government introduced recorded telephone calls that Evans had made from a local jail. During one conversation, Evans directed codefendant Tyson Anderson "to cut [his] phones off." (Stallworth Trial Tr. 32, vol. I, Oct. 28, 2008.) Evans, Lee, Mumphrey, and Vaughn used cell phones to communicate with their customers. The phones were vital: Evans testified that approximately 70 to 100 addicts in the area knew his

-9-

number and that approximately 500 addicts knew the number of either Evans, Lee, Mumphrey, or Vaughn. While Evans was in jail, Mumphrey obtained Evans' phones and gave them to Lee so that Lee could make money. Lee had again left Burlington for Bristol. He distributed crack from Frederick Cato's house with help from Mumphrey and Vaughn. That attracted attention, and law enforcement executed a search warrant there. Because of that, Evans ordered Anderson to cut the phones off.

The recorded jail conversations also demonstrated Evans' relationship with his family. Evans testified that he had attempted to isolate his wife and children from his drug business.

Evans testified against specific defendants. He stated that he had sold crack from Duty's car shop on Sixth Street in Bristol, Tennessee, that he had paid Duty crack for rent, and that Duty often served as a middleman between him and other users who frequented Duty's shop. Stallworth and Baumgardner bought crack from Evans at Evans' garage on Mary Street in Bristol, Virginia. Occasionally, Baumgardner and Stallworth did errands for Evans in return for crack.

Unlike his trial testimony, Evans' recanting letters and statements are inconsistent. On March 17, 2009, in a sworn affidavit, Evans stated that if he was called as a witness against Morton, he would testify that Morton was not involved in

-10-

the conspiracy, and that this case was "based on lies [and] threats." (Evidentiary Hr'g Government's Ex. 13, June 18, 2009.)

In his letter to the court dated April 12, 2009, Evans maintained that he had sold only user quantities, and knew only twenty-six of the fifty-one defendants indicted in the case. Notably, Evans stated that he would "continue to willingly and truthfully testify[,]" and only asked that "this so-called conspiracy . . . be looked into." (Evidentiary Hr'g Government's Ex. 12, June 18, 2009.) Finally, in a letter dated May 18, 2009, Evans claimed that while housed in the same jail cell, he and Lee had fabricated stories to make their proffer statements to the government appear more attractive.

At the hearing on his codefendants' motions for new trials, Evans claimed that he had falsified part of his trial testimony. He indicated that he and Lee had exaggerated the extent of the collaboration between them. He denied that he and Lee had worked together to transport drugs from Burlington to Bristol, that he had robbed dealers of their drug supply, that he had given Lee and Mumphrey a location and phones to make money, or that he had established a mobile home for Mumphrey's use in selling drugs.[5]

---

[5] Kerry Lee cooperated, pleaded guilty, and received a motion from the government requesting a downward departure. While his guideline range was 380 months to life, he was sentenced on June 8, 2009, to 180 months imprisonment.

On the other hand, Evans confirmed other aspects of his testimony. He related that he had truthfully testified about Duty, Davis, Baumgardner, and Stallworth. He confirmed that the government had not made any promises to him, except for that contained in his Plea Agreement. He admitted that he was a drug dealer. Yet he stated that believed that based on his "legal studies" in jail, he could get out of his Plea Agreement because of duress. (Evidentiary Hr'g 94, June 18, 2009.)

At the hearing on his present motion, Evans testified that he was innocent. He explained that at the time he signed his Plea Agreement, his attorney had advised him that a white jury would not acquit him, informed him that he would receive a mandatory life sentence because of his prior convictions, and threatened to withdraw as counsel if he elected to go to trial. He insisted that if he had been informed of the potential to avoid a mandatory life sentence, he would not have signed the Plea Agreement. Furthermore, he admitted that he had sold crack, but denied that he had been involved in the charged conspiracy.

## II

Federal Rule of Criminal Procedure 11(d)(2)(B) permits the withdrawal of a plea of guilty after acceptance but before sentence if "the defendant can show a fair and just reason for requesting the withdrawal." A defendant has no absolute right to

-12-

withdraw his plea, *United States v. Bowman*, 348 F.3d 408, 413 (4th Cir. 2003),

because it is a matter within the court's discretion, *United States v. Battle*, 499 F.3d

315, 319 (4th Cir. 2007). In deciding the motion, the court should consider:

> (1) whether the defendant has offered credible evidence that his plea was
> not knowing or otherwise involuntary; (2) whether the defendant has
> credibly asserted his legal innocence; (3) whether there has been a delay
> between entry of the plea and filing of the motion; (4) whether the
> defendant has had close assistance of counsel; (5) whether withdrawal
> will cause prejudice to the government; and (6) whether withdrawal will
> inconvenience the court and waste judicial resources.

*United States v. Ubakanma,* 215 F.3d 421, 424 (4th Cir.2000) (citing *United States*

*v. Moore,* 931 F.2d 245, 248 (4th Cir.1991)) (footnote omitted). An appropriately

conducted Rule 11 proceeding "raise[s] a strong presumption that the plea is final and

binding." *United States v. Lambey,* 974 F.2d 1389, 1394 (4th Cir. 1992); *see also*

*United States v. Puckett,* 61 F.3d 1092, 1099 (4th Cir.1995).

　　　In support of his present motion, Evans claims that his prior attorney failed to

adequately advise him of the sentence he faced if he was found guilty after trial.

Evans contends that the lawyer told him that if he was convicted by a jury, he would

be sentenced to life imprisonment, based on his prior record. In addition, he says, his

attorney told him that he would likely be convicted because his jury would be "all

white." Under these circumstances, he asserts, he felt he had no choice but to accept

the government's proposed Plea Agreement, under which the government would

-13-

dismiss two of his prior state felony drug convictions, requiring only a twenty-year term of imprisonment. In addition, the Plea Agreement allowed Evans the possibility of obtaining a motion for a downward departure based on his substantial assistance to the government, with a resulting sentence of less than twenty years.

Evans now argues that the attorney's advice was wrong. He contends that neither conviction qualifies as a statutory predicate, and thus he never faced a mandatory life sentence. Alternatively, he argues that even if the court rejects his argument that these convictions are not proper predicates, there is at least a substantial question as to their applicability, which his attorney should have told him prior to his guilty plea.

Evans thus contends that his guilty plea was not "knowing" and he should be allowed to withdraw it.

Evans' argument is based on the North Carolina structured sentencing scheme. The defendant concedes that he was convicted in a North Carolina state court of two "Class I" felonies: The first, on July 17, 1995, of possession with intent to sell marijuana, and the second, on April 17, 1997, of possession of cocaine. For the 1995 conviction, he was sentenced to eighteen months probation. That probation was later

-14-

revoked and he was sentenced to a term of imprisonment of six to eight months. For the 1997 conviction, he was sentenced to eight to ten months imprisonment.[6]

To be available as a predicate under 21 U.S.C.A § 841(b)(1)(A), a conviction must be for a "felony drug offense," which is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs." 21 U.S.C.A. § 802(44) (West Supp. 2009). If the two North Carolina convictions fall within this definition, then Evans faces a statutory mandatory life sentence. If not, he faces a statutory mandatory sentence of twenty years. *See* 21 U.S.C.A. § 841(b)(1)(A).

While these prior offenses are both classified as Class I felonies under North Carlina law, the defendant contends that based on his criminal history at the time, the maximum punishment that he could have been sentenced to for either crime was not over twelve months.[7] Thus, he argues, they are not predicates within the meaning of § 802(44).

_____

[6] Evans does not contend that his remaining North Carolina felony drug conviction, for selling cocaine on November 3, 1992, is not a predicate.

[7] The government does not contest this calculation based on Evans' prior record.

-15-

In *United States v. Pruitt*, 545 F.3d 416 (6th Cir. 2008), upon which the defendant relies (his present counsel was also counsel in *Pruitt*), the Sixth Circuit accurately described the North Carolina structured sentencing scheme, as follows:

> Under [North Carolina General Statutes] § 15A-1340.17, unless otherwise provided in a statute prescribing a specific punishment, the statutory maximum sentence for any given felony offense is derived based on two factors: (1) the defendant's "prior record level" as calculated under state law; and (2) whether the aggravated, presumptive, or mitigated sentencing range applies. *See* § 15A-1340.17(c)-(d). The defendant's prior record level (I-VI) is generally determined by "calculating the sum of the points assigned to each of the [defendant's] prior convictions." N.C. Gen. St. § 15A-1340.14(a). A sentence outside the presumptive range is permissible if the court determines that an aggravated or mitigated sentence is justified in light of the facts and circumstances of the case. § 15A-1340.17(c)(3)-(4).
>
> . . . .
>
> The structure of the North Carolina scheme effectively tailors the statutory maximum punishment available to each individual defendant. For a Class I felony, a hypothetical defendant with the worst prior record level (VI) is subject to a maximum term of imprisonment of 15 months under the aggravated range. That same defendant is subject to a maximum sentence of 12 months' imprisonment under the presumptive range, and to a maximum sentence of 10 months under the mitigated range. Conversely, a hypothetical defendant with the lowest prior record level (I) is subject to a maximum term of imprisonment of 10 months under the aggravated range. That same defendant is subject to a maximum sentence of 8 months under the presumptive range, and to a maximum sentence of 5 months under the mitigated range. *See* § 15A-1340.17(c)-(d).

*Id.* at 419-20.

-16-

In *Pruitt*, the court rejected the argument (made by Evans here) that whether the defendant was or could have been sentenced under the aggravated range was irrelevant to the determination of the conviction's inclusion as a federal sentencing predicate.[8] It is "top of the aggravated range, and not the presumptive range, [that] served as the 'statutory maximum' for Pruitt's prior convictions, irrespective of whether an aggravated sentence was imposed in Pruitt's case." *Id.* at 421.

On the other hand, the Sixth Circuit accepted Pruitt's argument (also made by Evans) that a defendant's prior record did create the equivalent of a statutory maximum and thus if a defendant could not have received a sentence over twelve months based on his actual criminal history at the time, then the conviction is not available as a predicate.

In doing so, the Sixth Circuit examined and rejected a Fourth Circuit decision, *United States v. Harp*, 406 F.3d 242, 246 (4th Cir. 2005). *Harp* held that in determining the career offender enhancement based on a North Carolina sentence, the court must consider the maximum term of imprisonment that could be imposed on a hypothetical defendant with the worst possible record. The Sixth Circuit noted that

_____

[8] In *Pruitt*, the ultimate issue was the inclusion of the North Carolina convictions in determining whether the defendant was a career offender under U.S. Sentencing Manual § 4B1.1, but the question was dependant, as here, on whether the prior convictions were punishable by imprisonment exceeding one year. *Id.* at 418.

-17-

*Harp* was decided prior to the Supreme Court's decision in *United States v. Rodriquez*, 128 S. Ct. 1783 (2008), which held that in determining the maximum term of imprisonment for a prior state conviction in the application of the Armed Career Criminal Act, the state ceiling for second or subsequent offenses, rather than the ceiling for first offenders, must be considered. *Id.* at 1788. In *Rodriquez*, the defendant had been eligible for a recidivist sentence, although it was not imposed.

*Harp* followed an earlier Fourth Circuit decision, *United States v. Jones*, 195 F.3d 205, 206-07 (4th Cir. 1999), which, in the context of determining whether a defendant was guilty of possessing a firearm after having been convicted of a crime punishable for term of more than one year, held that the maximum sentence under the North Carolina sentencing scheme must be applied, regardless of the defendant's actual prior record.

Most recently, a panel of the Fourth Circuit held, albeit in a nonprecedential decision, that *Rodriguez* did not weaken, but instead strengthened, the holdings of *Harp* and *Jones*. *United States v. Watson*, No. 08-4904, 2009 WL 1931226, at *1 (4th Cir. July 7, 2009) (unpublished); *see also United States v. Hooker*, No. 5:08-CR-361-FL, 2009 WL 1065865, at *2 (E.D.N.C. Apr. 20, 2009) (holding that *Harp* is binding precedent in spite of *Rodriguez*).

-18-

In light of this history, I cannot say that Evans' prior attorney was incorrect in advising Evans that absent the Plea Agreement, he faced a mandatory life sentence. More importantly, even if Evans should have been advised that there was some question as to the use of the North Carolina convictions, I do not find credible his contention that it would have made a difference in his decision to accept the Plea Agreement. After all, he exchanged at least the possibility of a life sentence at age thirty-five with the strong likelihood that he would receive a sentence of less, and depending on the extent of his assistance to the government, perhaps substantially less, than twenty years. In fact, it is clear that Evans had the close assistance of competent counsel in the negotiation of the Plea Agreement that he now wishes to repudiate.

Evans also contends that his attorney told him that he would be convicted because he was an African-American. While the government did not call the prior attorney as a witness at the hearing on the present motion, I believe that it was the strength of the government's case, rather than the defendant's race, that made it more likely that he would be convicted. Three of his codefendants who went to trial were white, and were convicted.[9]

---

[9] Evans' original attorney filed a Motion to Transfer Venue for Trial, based on the argument that the jury venire for his trial contained all white persons "except for one person who described themselves as 'Asian.'" (Mot. to Transfer ¶ 2.) Shortly after this motion was

An important consideration in this case is that Evans has made no credible

showing of innocence. Other than his current denial of guilt and claim that he simply

lied in all of his prior court appearances, he has not attempted to contest the factual

circumstances that support the government's allegations against him. I find his

current denial of guilt unbelievable, in light of his prior testimony and the overall

circumstances of this case.

The timing of his request to withdraw also supports a denial of the motion. I

believe it probable that his decision to recant his prior testimony came because he

decided, along the with other codefendants who now seek to withdraw their pleas,

that they could now more safely go to trial, since many of the cooperating defendants

had already been given reduced sentences and were less likely to continue to

cooperate. The substantial delay in the case is a factor I must consider, together with

the fact that withdrawal will prejudice the government's prosecution of others and

will have wasted judicial resources.

In summary, I find that Evans is simply trying to game the system by now

seeking to withdraw his prior plea of guilty. He pleaded guilty because it was in his

best interests to do so and not because of any lack of accurate advice as to the

consequences. He was given a thorough Rule 11 examination before his plea was

---

filed, but before it could be heard, Evans entered his guilty plea.

accepted, and his prior testimony and the other corroborating evidence apply supports his guilt.[10]


## III

For the foregoing reasons, it is **ORDERED** that the Motion to Withdraw Plea and Plea Agreement is DENIED.

ENTER: July 23, 2009

/s/ JAMES P. JONES
Chief United States District Judge

---

[10] At oral argument, Evans' counsel also urged that even if this court declined to allow the plea to be withdrawn, it abrogate Evans' appeal waiver contained in the Plea Agreement. However, even if the government elects to rely on the waiver in the event that Evans appeals the final judgment in this case, whether that waiver is enforceable will be up to the court of appeals. *See United States v. Poindexter*, 492 F.3d 263, 270-71 (4th Cir. 2007) (describing the circumstances under which court of appeals will enforce appeal waivers). While in general appeal waivers are enforceable, there is an exception for claims that involve "errors that the defendant could not have reasonably contemplated when the plea agreement was executed." *Id*. at 270 (internal quotation omitted).

-21-